Hanson, J.
delivered the following opinion.
In my opinion the plaintiff’s claim rests entirely on the devise of the second Charles Lord Baltimore in 1750, supposing nothing since done to bar his right of entry upon the death of Lord Frederick.
We are then to consider , first, whether or not Lord Charles second had any thing in Anne Arundel Manor which he *335 was capable of devising, w hen he made the will under which the plaintiff claims.
And here the first thing to be done is to determine the ^ . validity, or nullity of the settlement in 1698. As to the deed of 1730 both parties have rightly admitted that it had all the requisites of a deed; and they differ only as to its operation and effect.
To the deed of 1698 it is objected, that it was not acknowledged and recorded agreeably to the act of assembly, and of 1692. But although the words of that law are general, although the government of the province in the year 1698 was in the hands of the crown, I do not imagine, that, on just construction, the law extended to any kind of grants by the proprietary, whether they were grants ou original surveys, or conveyances of any part of the province, before surveyed, and reserved to himself. The species of grant can make no solid distinction. Either the act of assembly comprehends all, or extends to no conveyance by the lord. And inasmuch as the patents issued during its ex« Istence, have been uniformly held good, it is now too late to call them in question. I consider then the settle-of 1698 originally good, although neither acknowledged nor recorded.
'The interest of Lord Charleo second in Anne Arundel '.Manor under that deed, I conceive, was an estate-tail with the reversion in fee. Lord Charles first by that deed had conveyed the province of Maryland, and the manors, and certain lands in England to trustees, to the use of himself for life, remainder to his son Benedict, remainder to the issue male of Benedict and Lady Charlotte ‘Lee, his intended wife, in tail male, remainder to himself in fee. Now as Charles first and his son Benedict, were both dead, and Charles second was the heir male of Benedict and Lady Charlotte, and the heir general of Charles first, it follows -hat at the time of the devise be had an estate tail in Anne Arundel Manor, with the reversion to himself in fee.
When I say this, I mean that the statute de donis extend *336 ed to the lord proprietary’s manors at least, if not t the province itself. Against this idea I have heard no argument which has the least weight in my mind. It would ^deed appear extraordinary that a tract of land, or a manor in Maryland, whilst in the hands of the lord proprietary should not be subject to the statute, and that when it fell into the hands of an individual it should be subject to the statute. Whether or not the province itself might he entailed, is a question I hold not material in the cause, if it were material, I should incline to a decision in the affirmative.
I mean likewise that Charles second had an estate in Anne Arundel Manor executed by the statute of uses. It has been said with truth, that that statute under, the decision of 'the Courts of Law, executes no more than the first use, where there is a limitation of a use upon a use ; that where there is a limitation of a use upon a use, the second cestui que use has no remedy but in chancery, which will compel the performance of the trust, and that wherever there is a use, on which the statute does not operate, it is upon the same footing with all uses before the statute, which were never-held to be subject to the statute de donis. But I am clear, that the interest of Lord Charles second was not a use upon a use. • It is necessary here, to distinguish a little. The true idea of a use upon a use is, where there are two uses limited upon the same estate, or the same interest in lands. As where the whole fee or an estate for life, or an estate-tail is given to A* for the use of B. in trust for the use of C, there the statute executes the possession in B., the first cestui que use, and goes no further ; and the use limited to C. is determined to be on the same footing, as it would have been before the statute. But where lands are given to A. in fee to the use first of B., for life and then of C. in tail, there the statute executes the possession in B. immediately ; and upon his death, it executes the possession in C. In this case there is only one use limited on the estate for life, and one use limited on the estate-tail. In the other case there are *337 iwo uses limited on the same estate for life, or in tail, or m fee, which the Courts of Law said was absurd, and therefore void. In short, the difference is between a use upon a use, and a use after a use. The statute will not execute a use, but it will execute any number of uses, one after another, as they arise.
Lord Charles second then at the time of making the devise to the plaintiff’s lessor, being seised in tail with the reversion to himself ih fee, most clearly had something which he was capable of devising; and that was the reversion, which unquestionably may well pass by a devise.
On the extinction then of the issue in tail, supposing the estate not before barred, the plaintiff’s lessor became entitled to enter. That extinction took place by the death of Lord Frederick in 1771, and the lessor was then entitled to enter, unless Lord Frederick had done something in his life to bar him.
When I say Lord Charles second was seised in tail with the reversion in himself, it must be understood, that I conceive the settlement of 1730 did not defeat the deed of 1698, because, under the deed of 1730, he would have had only an estate for life, remainder to his first, second, &c. son in tail male, reversion to himself in fee. But with respect to the operation of the devise, the plaintiff is precisely on the same footing, whether Lord Charles second was seised under the deed of 1698, or the deed of 1730. Under both or either he had the reversion in fee, and the devise was intended to give Benjamin Cahert all the devisor could give in the manor of Anne Arundel.
Having proceeded so far as to say that Lord Charles second had a reversion in fee, and that such reversion was well devised, it remains to consider whether any thing was done by Lord Frederick amounting to a legal and effectual bar.
The first thing on this head to be considered, is, by what methpd the proprietary’s estate-tail in a manor may be barred. In what way an estate-tail of the province itself might *338 foe barred, I consider as not material, although I accede most readily to the position, that every estate-tail whatever, and the reversion or remainder thereon, may be barred in some way or other. That the estate-tail in Anne Arundel Manor could not be barred by a fine or a common recovery, in the Court of Common Pleas in England, I think, has been admitted ; but whether it was admitted or not, I am confident that no action in the Courts of Westminster ought ever to have affected lands in Maryland.
Supposing an estate-tail in the province itself, and an estate-tail of a manor in the lord proprietary to be on the same footing, there could, I conceive, be only four ways which could have been adopted for the purpose of barring it. 1. A common deed of conveyance, in the same manner as if the tenant in tail were tenant in fee; 2. A common recovery in the Provincial Court; 3. A fine on grant and render in the Provincial Court, in the same manner as is used by the king of England in the Common Pleas; 4. An act of assembly,
That it could net be barred by a common deed of conveyance, as if the tenant were tenant in fee, I think must strike every disinterested person on refection j because, if it could be barred in that way, it would be on the same footing in every respect as a fee-simple; and such a construction would give the lord proprietary a power, or a prerogative not enjoyed even by the king of England, his superior. On this subject it has been said, that if the proprietary could not bar the entail by deed, all ordinary grants by patent are on the same principle void. But I conceive from the charter of Maryland, and the object in granting it, and the manner in which it is to be enjoyed, that the person who holds the province, must for the time have die power of granting ordinary patents. So that the rights of patentees, their heirs and assigns are not at all involved in the decision of this question.
That the estate-tail (if such there could be) in the province itself might be barred by act of assembly, I suppose every one would admit. Whether a common recovery or a *339 line, would be most proper, or whether the proprietary might not choose either, for docking the entail of the province, is to be considered. I conceive that either way would be proper, because cither way was in use, and deemed right by the Court for barring entails of land held by common persons ; and because it seems that where the law has not already prescribed a mode, it will recognise the mode chosen by the party, provided it be convenient for the purpose.
I cannot, however, conceive that an entail of the province, and an entail of a manor in the hands of the proprietary, are on the same footing. It is the recovery of Anne Arundel Manor with which we are concerned. Had a private person been seised in tail of this manor, there is no question that lie might have suffered a common recovery. Common recoveries in Maryland were as usual as in England; and it would be vain at this time to question the propriety of that mode of barring estates-tail, reversions, and remainders.
To the recovery by Lord Frederick there are two objections. 1. That the lord proprietary being on a footing with the king of England, could not suffer a recovery in his own Courts; 2. That he did not suffer it in person, and there was not a good attorney.
As to the first objection, it has been settled that Lord Baltimore might sue in his own Courts ; and if it be not absurd for him to be plaintiff in his own Courts, it is not absurd for him to be defendant. The whole absurdity is supposed to arise from the style of the writ, and the submitting to his own Judges and officers. There might, indeed, be a very powerful objection against Lord Baltimore’s being, subject to his own creatures, if there had been any other mode for him to sue and be sued. That he might and did sue in his own Courts is a point well fixed- and ascertained, and, in my opinion, when this point was fixed, it determined at the same time that he might be sued.
Having said that Lord Baltimore might sue and be sued in his own Courts, it does not remain to be considered., which we? the best method to he adopted for barring en *340 tails, in a case not before provided for. The verdict states, with truth, that both fines and common recoveries had been commonly used in the province, at the time when the recovery in question was suffered; and Lord Frederick was as free to make his choice between them as any other person.
As to the second objection to the validity of the recovery, namely, the want of a good warrant of attorney, it is, I conceive, hardly entitled to a remark. When it appears from the record, that an attorney xvas admitted., it is too late to say, that although he was really the attorney of Lord Frederick, he ought not to have been admitted. Perhaps the commission of attorney-general was alone sufficient. Common recoveries are common assurances; and I believe there is no instance of determining a common recovery to be void merely for want of form, when all the parties requisite to the recovery appear to have joined in it. In short, the case before the Court, I apprehend to be far more important on account of the value of the thing in contest, than difficult of decision. The ingenuity of the counsel on each side has been displayed in raising points, many of which I deem immaterial. As to the point suggested by the Court, whether or not Benedict Calvert can take by a devise to “ Benjamin Calvert, Esquire,” without any other designation whatever, I conceive to be the most difficult of all which have been raised, and it would have been still more difficult for the plaintiff’s counsel to support, had the verdict stated the whole truth, viz. that in England., where the will Was made, there were several persons of kin to the devisor, who bore the name of Benjamin Calvert. However, as this point is immaterial for the defendants, on the supposition that the other points are in their favour, I shall give no further opinion about it. I have, indeed, ever made it a rule to determine nothing more than is absolutely necessary, and to leave those points which are foreign from, or immaterial to, the cause in hand, to be discussed in causes wherein a decision upon them may be essential.
*341 The Court gave judgment on the special verdict for the defendant. And,
The Court of Appeals, at June term, 1792, affirmed the judgment of the General Court.
Francis Hargrave, Esq. the author of the Notes upon Coke Littleton, having been applied to on behalf of the lessor of the plaintiff, during the pendency of this ejectment, gave the following opinion:
My thoughts on Mr. Calverfs case, and on the proper manner of arguing for his title to the estate of Anne Arundel Manor, in Maryland, being desired immediately, I am forced to express myself with great haste, and in more general terms than I should use, if the time necessary for considering a subject with so much importance and novelty in it had been allowed. I therefore desire to be understood, not as drawing out a regular and formal account of all the arguments and authorities incident to the case, but merely as giving a general view of my present ideas. It is pro» bable that many new lights may occur to me in future, and if it should be required, I shall be very ready to communi» cate them.
The case between Mr. Calvert and the grantees of Frederick Lord Baltimore, in respect to Anne Arundel Manor, is subject to a consideration very different from that which would arise, if the title to the whole province of Maryland should ever be contested by his sisters and heirs, against his devisee ; and as I think that pointing out what the difference is, will tend to give the best idea of Mr. Calverfs situation, I shall begin with so doing.
As between the devisee of Frederick Lord Baltimore and his heirs, there would be two great questions. One would be, whether the province of Maryland is entailable and devisable ; the other would arise only on the supposition that the property was entailable and devisable, and it would be, whether the means made use of by Frederick Lord Baltimore for barring the entails were effectual. If his sisters *342 and heirs could succeed on either of these questions, it would be equally fatal to his devisee ; though the consequences to the former would depend on the principles on which the dedsion against the heir should be founded. If the province should not be deemed either entailable or devisable, the two sisters of Frederick Lord Baltimore would take as genera? heirs of Cecil Lord Baltimore, the first grantee of the province. If it should he held that the province is entailable and devisable, but that the several entails are now subsisting for want of a sufficient bar, still the devisee of Frederick. Lord Baltimore would be disappointed, because then on hie death without issue, the reversion in fee of his father the secopd Charles Lord Baltimore, became an estate in possession, and consequently vested, according to his will, by which it is limited, on failure of his son Fredericks issue, to hir> own daughter, Mrs. Brovoning, in fee, subject to the payment of 20,000/. to her sister, Mrs. Eden. In observing that the reversion in fee of the second Charles Lord Baltimore came into possession upon the death of his son Frederick, I take it for granted that there is not either CecilliaCalvert, the brother of the second Charles, or any other issue male of Benedict their father, living, to claim the estate in tail male, limited to Benedict's first and other sons by the marriage settlement in 1698, which appears to have been the first entail of the province. I say that I take this fact foi, granted, for if the property is entailable, and the several entails still remain undisturbed, and there is any issue male of Benedict still living, such issue would have a good title as well to the Anne Arundel estate as to the rest of the province, against every other claimant. Such would be the two questions as between the sisters of Frederick Lord Baltimore and his devisee, and the different consequences of a decision against the latter, according to the principle upon which the case shall be determined. But one only question can, as I conceive, arise between Mr. Calvert and the grantees of Frederick Lord Baltimore, which would be, whether either of the modes adopted by him for barring the entail *343 of the Anne Arundel estate is sufficient in law. Both Mr. Calvert and his adversaries must agree that the property is entailable and devisable. If it is not, neither claimant has a title, but the estate clearly belongs to the heirs general of Cecil Lord Baltimore, the first grantee of Maryland, which heirs are Mrs. Browning and Mrs. Eden. The Anne Arundel estate being then admitted to be entailable and devisable, Mr. Calvert will be entitled, if the acts done by Frederick Lord Baltimore for barring the entail, are inefficient, because the estates-tail limited to the issue male of Benedict Calvert, by the settlement of 1698, and to the issue male of the second Charles Lord Baltimore, by the settlement of 1730, are both determined for want of objects, and the reversion in fee expectant on those estatcs-tail is now come into possession, and is vested in Mr. Calvert, under the will of the second Charles Lord Baltimore.
This brings me to the modes by which Frederick Lord Baltimore endeavoured to destroy the subsisting entails oi° Anne Arundel Manor, and to gain the fee of it. Une mode was the conveyance by lease and release; and I conjecture that this was adopted in consequence of a supposed resemblance between the property in question and another species of property of which the entail is certainly barrable by simple alienation.
If a lease is granted to one and his heirs during lives, such a descendible freehold, though not within the statute de donis, is in effect, entailable; and it is now well settled by a variety of adjudged cases, that the entail of a descendible freehold may be barred by mere alienation, whether by lease and release, or any other valid conveyance of a freehold. Why such an alienation is deemed to bar the entail, of a descendible freehold, will best appear from reading the series of determinations on the subject. These, as well as I am able to collect them at present, will be found by examining the following references. 2 Vern. 184. 225. 3 P. Wms. 262. 1 Atk. 524, 2 Atk. 259. 376. 2 Ves. 681, 3 Atk. 464,
*344 The shortness of the time prevents me at present from giving due attention to the cases which I refer to ; but I am in-dined to think, that the origin of holding alienation to be a ^ar t^le entaü of a descendible freehold, was the mode of barring the donor and the issue of the donee in the case of a fee conditional at common law. Before fees conditional were converted into estates-tail by the statute de donis, the donee’s alienation, after performance of the condition by the having of issue was effectual, both as against the donor, and the issue of the donee. This most probably was what first suggested the idea of attempting to bar the entail of a descendible freehold by lease and release, which, by force of the statute of uses, is a mode of alienation as legal as feoffment, or any other common law conveyance. At length, the validity of thus barring an entail by alienation, was brought into question in the Court of Chancery, and there it being allowed, that a descendible freehold was entail-able, though not strictly within the statute de donis, the Court was driven to the necessity of acknowledging some mode of barring the entail; and as a common recovery could not be suffered of a descendible freehold without a forfeiture of the estate, and as a fine, in most cases, is not sufficiently extensive in its operation, simple alienation of the property seemed to be the only mode left for the choice of the Court, and was with less scruple adopted, as having been already applied to the case of fees conditional at the common law. It may, however, be observed, that it would have appeared more conformable to the principles of the common law, if, in consequence of holding descendible freeholds entailable, though not strictly within the statute de donis, the Judges had deemed them totally subject to the same consideration as fees conditional, and had declared that alienation should not be a complete bar of the entail, till after the having of issue. But the doctrine is now settled otherwise, and it is only necessary, on Mr. Calvert's part, to show an essential difference between the case of a descendible freehold, and that of Anne Arundel Manor, between the *345 lord proprietor and others. Feigned recoveries are liable to the same consideration as recoveries really adverse. The former can be prosecuted only where the latter may be. In England the only Courts for original suits to recover the freehold and inheritance of land, is the Court of Common Pleas. In that Court only really adverse recoveries of the freehold and inheritance can be had; and, therefore, in that Court only, can common or feigned recoveries be suffered. The rule must be the same with respect to land in America. Whatever the Court is, in which suits for the freehold and inheritance of land in Maryland,, between the lord proprietor and others ought to be prosecuted, that must be the Court for every common recovery to which he is made a party. Now, on the part of Mr. Calvert, it should be insisted, that though the Courts of Justice in Maryland are certainly, in general, the proper jurisdiction for trying the right to land in Maryland,, yet they are not so in the particular case of the lord proprietor. I apprehend that the Courts of Justice in Maryland,, for trying the title to land, are the Courts of the lord proprietor who happens to be in possession; that the Judges are appointed by him, and are removable at his pleasure; that they exercise their jurisdiction as his delegates ; that the process of the Courts runs in his name ; and, in short, that they are in every sense of the words, the Courts of the lord proprietor, as much as if he presided in them, and administered justice in his own person. Is it possible that Courts so constituted, should be the proper jurisdiction for trying suits in which the lord proprietor is either plaintiff or defendant ? Would not the allowance of such a jurisdiction, in effect, render the lord proprietor a judge in his own cause ? Is it agreeable to na-.Sural justice, that a judicature so partial should be established ? Could it be the intention of the crown, in granting the charter under which the Courts of the lord proprietor sire erected, to extend his jurisdiction to causes in which he is a party; or if such was the intention of the crown, could "J\ be within the power of the crown to invest him with such *346 a jurisdiction; or rather was it not contrary to the fundamental principles of the English law and constitution, to make the.lord proprietor a judge in his own-case? Is there any instance,.except the single case of the king, in which the law of England permits any person to be the judge of his own cause ?■ The words of ILovd' Hardwicke, in the case between the Earl of Derby and the Duke of Athol, on the title to the Isle of Man, as reported by Mr. Vesey in his second volume, 204. are very strong against such jurisdiction. He says, “ the question here is to the title and right to the whole island, which cannot be determined in the Courts of Man, because that would be permitting the persons who claim the seigniory of the isle to judge in their own case.’*
But if the Courts of the lord proprietor cannot take cognisance of suits to which he is a party, it may be asked, what is the jurisdiction which must be resorted to ? Some Court there must be, to prevent a failure of justice ; and it seems incumbent upon those who deny the competency of the proprietary Courts, - to point out another jurisdiction which is competent; and this I think may be easily done in the case in question, which is that of a suit for the freehold* and inheritance of land in Maryland. There are only two Courts, exclusive of tin; Courts in America, which can pretend to a jurisdiction over such suits. These are the Court of Common Picas in England, and the Court of the King in Council. Whether the jurisdiction belongs to both concurrently, or to one only; or if to one only, whether the former or the latter has the better title, is wholly immaterial to Mr. Calvert, because if either has the jurisdiction, hie purpose is answered. But it seems clear that from the nature of the Constitution, as well as from authorities of law* that the jurisdiction is vested in the King in Council only.. America is out of the realm of England, but the process of the Common Pleas is confined to England, and that Court cannot issue writs for the delivery of the possession of lands in America. But the same objection will not apply to fbe King in Council. The appellant jurisdiction of f.hn *347 Mng in council, with respect to all civil causes from America, has Leen exercised ever since the establishment of our colonies, and is not now to be called in question. It arose at first from the necessity of the case, and because there was not any other Court which seemed to have the least pretence for claiming such a jurisdiction. The like necessity will equally justify at least the exercise of an original jurisdiction. If there are special cases of suits for land in America to which no court there is competent, and the ordinary Courts of Justice in England cannot entertain them, what jurisdiction can be resorted to, except the king in council ? The title of the king in council to an original jurisdiction in such case, would be reasonable and constituí tional, even though the privy council was not already in possession of an appellant jurisdiction over causes from America ; but the latter being now settled, is a fair precedent for admitting theformer, wherever the reasons on which the latter was first allowed, strongly and fully apply. This kind of reasoning seems so forcible, that perhaps that, unasf isted by positive and direct authorities, it might be sufficient to prove the original jurisdiction of the king in council over such suits for land in America, as, for any special reason, cannot be prosecuted in the Courts there. Bui authorities and precedents of law arc not wanting. In the reign of Queen Elizabeth, there was a controversy about the title of the Isle of Man, between the then Earl of Derby and the daughter of the preceding earl, and it appears by the reports which we have of the ease, that the proceeding was before the king in council, and that by his command the matter of law was referred to the lord keeper of the great seal and divers of the privy council, and the two chief justices, and the Chief Baron Zee. 2 And. 115. 4 Inst. 284. The case o£ America is of the same kind, when there are contests between one province and another province about boundaries, or between two competitors about the title to the whole province» Accordingly, Lord Hardtoicke, in the case of Dean and Baltimore. 1 Ves, 447 mentions the ori *348 ginal j una di ci ion of the king in council in such eases, an«x. others of a similar kind, as a thing certain. If it should be attempted to distinguish between a suit for the whole province of Maryland, and one for a parcel of land within it, the proper answer I think is, that whatever differences there may be in other respects, they are the same so far as regards the impropriety and illegality of allowing a jurisdiction to the court of the lord proprietor in his own case. Lord Hardwicke held that reason alone to be sufficient for denying the jurisdiction of the Court of the Isle of Man, over suits for the seigniory of that isle; and where the lord proprietor of a province in America is party to a suit, the reason is as applicable to a suit for a part of the province, as a suit for the whole province. There may perhaps be other reasons why the Court of a province in America should not be competent to a suit for the xbhole province, such as are not applicable to a suit for pari of the province. But if the lord proprietor’s being a party,- is of itself a sufficient objection to the jurisdiction of his own Courts, it becomes unnecessary, on Mr. .Calvert''s part, to seek for assistance from those other ■reasons, and he will not be affected, even though they should not extend to the Anne Arundel Manor. I have now finished the arguments against the common recovery suffered by Frederick Lord 'Baltimore in his own Court, and in order to give them all possible force, I recommend it to the gentlemen concerned for Mr. Calvert,' in America, very carefully to peruse and consider the case of the Earl of Derby and the Duke of Athol, in 1 Ves. 202. That of Pain and Lord Baltimore, in the same book, 444.; and the case in respect to the Isle of Plan, in 2 Ves. 337. From the whole of what I have written, which is much more than I expected it would have been when I began, it appears that there are two-great and general propositions proper to be insisted upon for Mr. Calvert, one is, that a common recovery was the only mode by which Mr. Calvert?a reversion in fee in the Anne Arundel Manor could be barred. The other is that the recovery suffered by FrrdnkL Lord Baltimore was not srT *349 fered before the proper jurisdiction, and consequently is ineffectual. If both these propositions can be supported, Mr. Calvert's tide seems uncontrovertible; but if either fails, I think that he cannot succeed in the ejectment he has brought.
I have not observed any thing in respect to the mistake of Mr. Calvert's Christian name in the will under which he claims, because I apprehend that there cannot be the least doubt of his right to prove the mistake by parol evidence,
FRANCIS HARGRAVE»
Lincoln's Inn, 17th January, 1774.
Continuation. If what I have written in respect to the origin of holding alienation a bar of the entail of a descendible freehold, is well founded, it is evident that it is held to be so, from the necessity of the case, and because there was not any other mode which the Judges had any pretence for allowing. But how is the doctrine applicable to the case of the Anne Arundel Manor f In that there is an estate of inheritance, it is entailable within the statute de donis, and a common recovery may he suffered; for there must be some jurisdiction competent to the trial of suits about the inheritance of the estate, and if there is, common or feigned recoveries may be prosecuted before that Court as well as real recoveries. Alienation is a bar of the entail of a descendible freehold, because a common recovery cannot be suffered: but alienation is not a bar of the entail of Anne Arundel Manor, because a common recovery may be suffered.
It is not necessary to inquire here which is the proper Court for such a recovery. In this part of the argument it is sufficient that there must necessarily be some Court in which a recovery may be suffered,
The second mode which Frederick Lord Baltimore made ■use of for barring the entail of Anne Arundel Manor, was a common recovery in his own Court, as lord proprietor of .Maryland. Here it should be insisted that so far as regards the kind of jurisdiction which 5s competent to the tsht of suits for land.
*350 Notes concerning the rights to the province of Maryland, by the late Daniel Dulany, Esquire.
Lord Charles seised in fee of the province of Maryland\ on the marriage of his eldest son Benedict, conveyed to trustees to the use of Lord Benedict, for life; remainder to the trustees to preserve contingent remainders; remainder to the first and every other son of Lord Benedict, in tail; remainder to his own right heirs. Lord Charles, the eldest son of Lord Benedict, became seised in tail male, and having the reversion in fee on his marriage conveyed to trustees to the use of himself for life; remainder to trustees above; remainder to his first and every son in tail male ; remainder to his own right heirs. Having issue of the said marriage, Frederick, now Lord Baltimore, and two daughters, Louisa and Caroline, he devised the province of Maryland to trustees to the use of his son, Lord Frederick, for life; remainder to the trustees above ; remainder to his first and every other son in tail; remainder to his eldest daughter Louisa, in fee, chargeable with 20,0001. sterling, payable to his daughter Caroline.
Note. By the settlements above, besides the province, other rights, such as the tonnage, are conveyed to the above uses, and by the will the province only is devised.
Frederick Lord, Baltimore, on his marriage settled by deeds, in 1753, by conveyance to trustees, as above mutatis mutandis. His lady being dead without issue, all the purposes of the deeds of 1753 are answered, so that he had such estate as before the deeds of 1753. In 1761, by deeds of lease and release, Lord Frederick conveyed to trustees to the use of himself, 8:c.; remainder to the use of Cecilius Calvert, &c.; remainder to such use as he should appoint by deed to be execute!.! In the presence of two witnesses, or by will, and in default, to the use of the persons named in the will of Lord Charles.
.It is said that Cecilius is dead without issue, though I *351 Well remember an intimate friend of his (Mr. Anderson of London, merchant) told me Mr. Cecilias Cahert assured him he was married, and that he had a son bom in wedlock; that son is now alive, but it is said he is not legitimate. However, to proceed on supposition of the death of Cecilias Cahert without issue.
T he question will be, whether Lord Frederick can bar by any act, and whether he has, by the deed of 1761, barred the right of Louisa under the will of her father, her father having the reversion in fee, if the province is clothed with a capacity of entail.
It is said, indeed, to have been the opinions of Mr. Jardrell, Mr. Wilbraham, and others, on a case stated by Mr. Benedict Cahert, to whom Lord Charles devised Anne Arundel Manor, and also the opinions of Lords.Worthington, Camden and Sir E. Wilmot, on the marriage of Lord Frederick, that the devises to Louisa and Benedict Calvert, were to take-effect only on the death of Lord Frederick, within age, and without issue. On perusal of the will of Lord Charles, I can find nothing to justify this construction.
Is the province entailable ?
First point. Is the seigniory a subject capable of entail ?
Second point. Does the statute de donis, &c. or do the rules of the common law govern l
1st. I apprehend the subject is capable of entail. It is included within the term used in the statute de donis, viz., u tenements? which comprehends all corporeal hereditaments, and incorporeal, which sayour of the realty, which issue out of corporeal, or which concern, are annexed to, otare exercisable within the same. Co. Lift. 19, 20. Officer, and dignities which concern the realty, or have relation to certain places, are entailable. 7 Co. Rep. 33.
2d. I apprehend the province is v/ithin the statute dc donis, See.
Lord Ifacclesjield, perhaps, went too far in saying that the law we call common law was originally introduced by sta *352 tutes which have been lost; but probably a great deal of: this law was introduced by statutes. Vide Hale's Hist, of the Common Law.
It is a general rule that nova constitutio futuris formant debet imponere non preteritis : had the charter been granted before the statute de donis, &c. then, according to the rule, 1 Inst. 9. 4 Inst. 201. 284. 2 And. 115. the common law would govern, being the law of England; but the grant has been made since, and at a time when the common law was altered by the statute, and therefore according to the rule above mentioned not being the law of England, it cannot govern the charter.
There does not appear to me to be any ground for contending, that such a limitation as would make an entail of Sands in England, will make a conditional fee when applied to the province, i. e. that the grant of the province ought to be governed by a law which did not exist in England when, it passed the seal, merely because it once did exist.
If the rules respecting estates of inheritance at common law were not, according to Lord Macclesfield's doctrine, introduced by statute, yet, without doubt, considered as lex non scriptm the law might be as effectually abolished by statute, as if it had certainly been lex scripta.
Put the case that the estate called fee conditional had been introduced by statute in the time of Henry VIII. and that it had been altered to an estate-tail by a statute of Ed ward VI. there could be no reason to say, that the charter granted by Car. I. should be governed by the statute Hen. VIII. and it seems to me that mutatis mutandis, the same reasoning applies to the case.
It is commonly said that the common law, and such statutes of a general nature suitable to their circumstances as were made before their settlement extend to the plantations. This is to be understood in reference to the rules obtaining in the plantations, and even in this respect, it would be a strange incongruity to say that when the common law ?s *353 abolished by statute, both the common law and that statute extend hither; that is, that estates of the same nature should be governed by opposite or different rules.
It may be inferred from the several settlements that the advisers of them were of opinion the grant was affected by the statute de donis, &c. the purposes and provisions intended to be made would not otherwise have been answered. The remainders limited after the determination of the estates limited to heirs of the body would have been void. From the charter, moreover, it may be inferred that the Statute dc donis was understood to extend: for parcels are thrreby grantable in tail, as well as in fee, but if the entirety be not entailable, on what principle are parcels ?
If the province be not entailable, neither is it devisable, •J. e. if the statute of Edw. I. does not extend, neither does the statute of I Jen. VIII. extend to the case.
There possibly may be another question, should a will be made according to the statute of Hen. VIII. and not ac - cording to the statute of frauds and perjuries, the latter act having passed subsequent to the charter.
Supposing the province entailable, the next question will be. whether the estate-tail be barrable er not ? It is clearly not barrable by fine or recovery, either in England or Maryland; is it then barrable any other way? By act ofparlia» ment it certainly is, and it should seem from the writings in. 1753, that this method was advised as the proper one ; but this cannot be called a remedy; it is not a power incident to the estate. It might be refused or granted.
The question then is brought to this, is it barrable by common deed ?
It may reasonably be inferred from the settlements that it was not so understood: what security of family provision, the great object of settlements, if the estate barrable by common deed ?
If thus barrable, then the tenant in tail would have a power over his estate excluded by the statute de donis: he would have a power too, that did not belong to a fee condi *354 tioual at common law: for one having such estate couid no'. bar, but postproleni euscitalam,
But if not barrable bv common deed, then a perpetuity , which it is said the law has so great an abhorrence of, at. not to allow it in any case.
Here is the stress of the objection. The entail of a copy-hold, it is now settled, is barrable one way or another by recovery, surrender, or forfeiture and regrant, and that whether there be any custom for it or not; and the very principle thereof is, that there may not be a perpetuity, which the law abhors.
lienee' it is argued, that as a copyhold is barrable by surrender, &c. on account of the imbecility of the estate, so the province by common deed on account of the magnitude oí it, and that the same reason applies in both cases, the avoidance of perpetuity.-
It was certainly the Attention of the statute de don/s to create perpetuity ; but policy found out a fiction by which, that intention was defeated.
The same policy has at length determined all copyholds to be barrable one way or another; and it is no wonder it should, if what is said in the book called Lex Manerwrum be true, that the greater part of the estates in the kingdom are copyhold, or customary estates.
In what did the policy consist ? In giving a power, by which there might Lc a circulation of property preventive of too great influence, and encouraging social industry; but, perhaps, the reason does not apply in the present case, which is of a very peculiar nature, and it might not be proper to allow a power ©f alienation when the purpose for which it it allowed in other cases does not occur.
By the power of alienation, in the above instances, lands were split and divided, and instead of being in the hands of one fell into the hands of many: thus too great influence was guarded against and a general encouragement to industry was given. Had there not been this effect, had lands nassecl entire from one to another, the end would not *355 /save been answered. The province is an entirety. It cannot be split and divided : the lands w’l dn it are alienable, and devisable. If there was not a power in all the settle-1 tnents to grant out in parcels, perhaps, considering the nature, end, and view of the original charter, considering the express power given by it to grant parcels in fee, tail, ike. ¡such power would always attend the propriety. If there would not be such an incidental power, at present there is no objection to the settlements on this head, because it is expressly given.
This being a peculiar case, the objection from the abhor» renee of perpetuity has the less weight, and tile rule is laid down too largely, that to every estate-tail there is necessarily a power of barring it belonging to the owner.
• A common recovery cannot be had of the province in Maryland; for the very instant the Judges should give judgment, they would of course determine their own commission. If Lord Baltimore had no right to the province, which the recovery would suppose, he had no right to appoint the Judges; in England there could be none, for the subject ought to be there in some county.
The peculiar situation of the subject is such that a prascipe will not lie.
Is there no case where there is an entail not barrable Such is the case of the king. The king is bound by the statute de dome. He cannot suffer recovery because no praecipe will lie. He cannot bar by letters patent. Willion v. Lord Berkley, Plowd. Comm.
In the case of a dignity entailed, it is not barrable, though within the statute de donis. The policy does not apply to it.
Perhaps it may be surrendered: but this may he refused, and therefore not in his own power.
If this may be surrendered, why not the province ? Ill ease of surrender, the issue mav have a conoinl out of the enrolment. Bro. Sur. pl. 51.
*356 The tenure is by free and common socage by fealty only for all services, and not in capite, or by knight service. Had there been no tenure reserved it would have been of the king in capite. Vide 9 Co. 123. Bro. Tenures, pl. 3. 65. 6 Co. 6. b. Perk. s. 680. Bro. Tenures, 100. Dyer, 44. pl. 29. 58. pl. 6.
As the tenure is, no license is necessary : according to this idea is the statute of William III. which restrains the alienation of assignees to a foreigner without license of the crown.
Though the province or propriety be entailable, yet the tonnage clearly is not, for it is not a tenement. Lord Charles-has not disposed of it by his will. With respect to this therefore Lord Frederick may dispose by will or deed. A conditional fee and reverter cannot exist at the same time in the same person, but the having the former is an extin» guishment of the latter.
Lord Frederick had a power to grant out parcels, and s© had his father. In all these grants, the rent has been reserved to the grantor and his heirs, without any reference to (the power, or to the settlements. The validity of these grants will not, I hope,' be questioned. The rents could only be reserved to the grantors, and their heirs; a reservation to any other would have been void.
Lands have escheated, and been granted out under rent reserved as above.
On the supposition that these grants are good, the parcels granted are severed, and the rents being reserved to the grantors and their heirs, belonged to them, and that being so, are not affected by the settlements, and, consequently, might be disposed of by deed or will; but yet this could hardly be the intention of the settlements, and especially when the restriction annexed to the power in respect to the quantum of the rent is considered.
The subject being peculiar, it is no wonder that every contingency was not provided for.
Where there is a particular estate of the seigniory and' ar. *357 escheat of the tenement, the seigniory is extinct; but who shall have the tenement l It seems reasonable that there should be such respective interests in the tenements as there were in the seigniory. In Fitzherbert’s FJ. B. it is said that he who has the seigniory for life may enter, but not what he shall take. In Keilvay, 114. or 141. it is said if he does not enter, he in reversion cannot, but may have his writ of escheat, and it is said it was his fault he had connection with one who neglected to enter ; but if the tenement on the entry should entirely belong to the person having the particular estate, it would be improper to say that he in reversion suffered by the neglect of the other, since he would gain by it in having it in his power to recover by writ of escheat.
In the case of forfeiture of copyhold, it is said the dorninuspro tempore shall have it. In the case of purchase made by a villain, one having a particular interest shall have the land entirely. §>ucere hereon.
Suppose the province should devolve on the two sisters of Lord Frederick by descent, what would be the consequence ? In the case of the crown, the elder would succeed, and for a very good reason, which seems very strongly to apply to the province, though not entirely. In the case of the crown, the inconvenience of two of equal power and authority, differing in opinion, would be intolerable; there would be no superior to redress it. But not so of the province, for the sovereignty being in the king, the royal interposition might redress.
In the case of dignity, which is not partible, it may be conferred by the king on either of the sisters. Some hold that until the king confers, it descends to both ; others that it is until then in abeyance. The earldom of Chester descended to females, the possessions partible, but not the dignity. Vide Co. Litt. Black. Comm. „ In the case of office, the sisters to appoint a deputy ; but if the elder marry, her husband shall officiate. Vide Co. Litt.
In the case of a manor descending to females, it is partible. and each has a manor and court-baron; and in the case *358 of the county palatine of Leinster, partition was made among four females, and each had a severed county palatine. Dav. Rep. 61. The idea of division, considering the nature of the subject, seems very strange.
If between two sisters, then between fourteen ; so mam’ distinct governments and legislatures ; should the whole fall afterwards to one, what strange confusion!
If a female married, and having had issue by her husband, dying, he tenant by the curtesy, there would be no inconvenience in this. Suppose a proprietor leaving a wife entitled to dower, what would be the consequence ? Vide Godb. 135. Co. Litt. 30.
County palatihe bos jura regalia; royal jurisdiction and seigniory severed from the crown. Vide Plow. Comm. 215. b. Dyer, 321. 345. Dav. Rep. 62.
The power, king like, may pardon treasons, felonies, &c. make judges, &c. indictments, &c. and process, in their name. Vide 4 Inst. 204. 2 Lutw. 1235. The bishop of Durham in loco regis ; county palatine had torn libére per gladium, prout rex Coronam. Vide 1 Bulst. 160. 2 Bulst. 227.
Though exercised here very extensively in. erecting ■ Courts of Equity and Admiralty, yet the power of erecting jurisdictions seems to be confined to the common law. The words of the charter, it is true, are very large, but it seems that the king cannot give power to erect such Courts. Vide 12 Rep. 51. Jenk. 285. pl. 18. 10 Mod. 125, 126.
■ By the 27th Hen. VIII. c. 24. the power of making juclges and pardoning offences, and the style of indictments and process -altered. Quaere.. The extent of this statute, and how far the charter of Maryland affected by it..
The province of Maryland is no part of the realm, nor of Hen. VIII.’s dominions ; if, therefore, it is affected, it must be by an equitable construction : the long usage should operate against construction.
Suppose a feme covert to have the seigniory and proprietary ; in whose name are laws and process to be had ? In the case of the crown, as in the time of Queen Arme, married to *359 Prince George of Denmark, in her name, her husband a subject.
How shall grants be made effectual lo bind her and her heirs ?
So much embarrassment and inconvenience on same events, may arise on account of the peculiarity of the case, that probably the government as well as of man, and as well by the letter as the spirit of the above statute of lien. VIII. may fall into the hands of the crown. -
By the statute quia emptores terrarum, the tenure should be of the king, on grants made by the proprietary. §>iimre. T he non obstante clause. Vide 1 W. & M. sess. 2. c. 2.
The last proviso in this act clears it up. The construction of Lord Charles’s will does not seem to me maintainable. There is not a syllable of the death of Lord Frederick in his minority, and I think it would be going much too far to supply these words by the argument, “ otherwise Lord Charles meant an act of injustice to his son.”
The statute de danis, &c. passed in the time of Edzu. I. and before the time of Edzu. III. Count was the only name of dignity and honour in England. The titles of Duke, Marquis, and Viscount, are of later times. The first Duke in the time of Edw. III., the first Marquis in Richard II., and the first Viscount in Hen. VI. The name or title of Baron is not of dignity, or addition. Dav. 60. Vide Co. Mitton’s case.
5 Edw. III. 58. Fitz. Jurisdiction, 61. 1 Edw. IV. 10. 45 Edw. III. 17. 5 Edw. II. Fitz. Quare Inpedet. 12 Eliz. Dy. 288.

Another opinion of Daniel Dulany, Esquire.

I must confess that I had great doubt of the power of Lord Frederick to devise the province, not because I thought it to be unalienable, or not entailable ; but because I was not satisfied of his power to bar the reversion devised by his father to Mrs. Browning. What follows may serve to explain why I entertained this doubt.
*360 The name of the lord proprietary is used in all process in. Maryland, as the king’s is in England. Indictments charge offences to be against his peace, good rule and government, Provincial laws are enacted in his name by and with the advice, &c. The king’s name is never used in Maryland, in executing or enacting any laws. Even prosecutions upon the penal statutes of England are in the name of the lord proprietary. All lands in Maryland belonging to the inhabitants are entailable, and estates-tail, remainders and reversions are barrable by common recovery in the provincial court. The charter of the province was long after the statute de donis. The charter speaks of grants in tail. It has been the usage and practice to entail lands, and bar by recovery in the provincial Court. This usage has been referred to, recognised, and confirmed by acts of assembly. Verv many titles depend thereon; the statute de donis and mode of conveyance by common recovery are observed as established rules of property, and so of the statutes of uses and of wills. The oath of judges prescribed by act of assembly is to do equal right according to the laws, customs and directions of acts of assembly, so far forth as they provide; and where they are silent, according to the laws, statutes and reasonable customs of England, as used and practised within this province.
Land is granted to the king in tail, remainder to A. B. in fee, the king cannot bar the remainder by common recovery, neither can he bar by grant. Plowd. Comm. Willion v. Lord Berkley, and the case of Altonwood in Co. Rep,
Perpetuity is odious. Many million of acres of land are contained within the boundaries of this province ; but the. property is principally in tenants paying a quit-rent, who have as full power to bar by recovery in the provincial court as any in England to bar in C. B. This property is most open to alienation.
If the lord proprietary could not suffer a common recover) , though every inhabitant may as above, it seems to arise, from his exercising regal powers under the charter, and be* *361 >:ng considered in loco regis. Indeed I cannot conceive how a common recovery can be suffered by the lord proprietary of the province. The Judges derive their capacity, as such, from his appointment, and should a recovery be suffered before them of the propriety, and he thus cease to be lord proprietary, they, too, must cease to be Judges. The existence of their judicial power would be incompatible with a judgment against the proprietary under whose commission they are Judges. As to his suffering a recovery in England, it seems to be a strange notion. It is said there are precedents of recoveries in C. B. of lands in the plantations. but if there have been such recoveries, and they are effectual, they must have been under act of assembly; but there .is no such act in Maryland. If Lord Baltimore could not bar by common recovery, neither can the king ; and yet. if Lord Baltimore might bar by lease and release, though the king cannot by grant, the following doctrine is the result.
Every person having an estate-tail in land in Maryland may bar that estate and a remainder thereon, and reversion in the same and in no other manner in the Provincial Court, that a person in England having a similar estate there, may in C. B., except the lord proprietary, because being in loco regis, a prcceipe will not lie against him; but since he cannot bar by recovery, he may by lease and release, though the king cannot either by recovery or grant; such being the peculiar situation of the lord proprietary, that he is in one respect in loco regis, and to be considered in another, in a different light, and to have a power to bar by lease and release in order to prevent the establishment of an odious perpetuity.
In the case of The Earl of Derby v. Duke of Athol, Lord Hardwicke observed, as I have been informed, that if the private act of James I. intended the like effect with the statute de donis, there was no occasion for the restrictive and prohibitory clause in the act, in respect of the estate-tail, because there could be no fine or recovery, and therefore no method to bar it. The settlements, which *362 have been made on the marriages of the lords proprietaries, I supposed, were upon the advice of able counsel, who did not entertain the idea of a power to bar by lease and release, and that Mr. Booth’s was not singular. But as so many eminent lawyers are now of opinion in favour of the bar by deeds of lease and release, I am to suppose that I should have had less doubt if I had had more knowledge of the subject; but I do not understand why it should be thought that the propriety of Maryland was not entailable, or that the law of England, as it stood before the statute de donis, extended to Maryland,, though it ceaséd to be the law of England long before the charter o'f Maryland, or any discovery made that such a country existed.
As to the tonnage, I apprehend it is not a tenement, nor does it partake of the realty, and therefore it is not entailable, wherefore the estate limited being a fee conditional, when Lord Charles made his will, he had only a reverter, possibility, or condition in law.
Though some very modern resolutions have gone a great way in favour of the power of devising, yet I do not know that a condition in law, or 'in fact, has been held to be devisable. The statute de donis divided the estate, which was before entire in the grantee subject to a condition in law; and according to the old doctrine, this possibility, or condition, was not grantable, or devisable. I do not know that this doctrine has been overruled in the point, that it has been'directly held a condition in law or in fact is devisable, that there is a reasonable ground for a distinction between a condition in law and in fact, as to this matter, nor do I clearly perceive why, if after the creation of a conditional fee, the reverter or condition in law is grantable, or devisable, such reverter or condition may not be granted at the very time of creating the conditional fee, nor why, if a condition in fact be grantable, or devisable after the creation of an estate in fee, subject to such condition, such condition may not be limited to C. upon a grant of A. to B.
The case of The Earl of Stafford v. Buckley, in 2 Ves. Rep. *363 seems to me to be very strong in favour of the first point, that the tonnage is not entailable ; and Lord Hardwicke in this case seems also to have allowed the old doctrine respecting conditional fees and reverters ; but if the Judges were of opinion, in the case of Selwyn v. Selwyn, in 2 Burr. as the reporter (and I suppose upon proper grounds) has in* timated, that a voidable contingent executory use to arise out of a subsequent recover}-, was devisable, the reason and principle of this opinion may be of extensive application, nor shall I venture to suggest my opinion upon the point whether the reverter or condition ia law was devisable or not; but if it was not devisable, then I conceive it became extinct upon the descent of the condition to Lord Frederick, and he therefore had upon the matter an absolute fee-simple which he might dispose of as he did. If, however, the. tonnage belongs to Mrs. Browning under the devise to her of the reverter or condition in law, it is to b© considered, in respect of the charge in favour of Mrs. Eden, that the charge was laid upon the whole subject, that Lord Charles intended a greater profit to his elder than to his younger daughter, and that the 20,000/. was more beneficial than half the value of the tonnage. Indeed, as to the value of the whole subject intended to be devised by IFrd Charles, it is very great. The revenue for the support of government, fines, forfeitures, appointment to offices, presentations to forty-four livings, caution money for vacant lands, quit-rents, fines of a year’s rent upon every alienation, escheats, manors, (as they are called,) reserved lands, as well as the tonnage, constitute the subject intended to be devised to Mrs. Browning, a subject which, I think, if purchased at the price of 400,000/. sterling, would be purchased at a very moderate rate ; and it would seem to carry the fiction of a recompense beyond the supposition, there being no possibility of a recompense, as there is no instance of a similar estate or subject.

*364
Letter to John Hall, Esq, ,

Sir,
Mr. Hamersley, in his letter of the 29th last July, received by the last post via Nexo-Tork, desires, in the special verdict in the cause of Calvert v. Tenants of Anne Arundel Ma» ñor, that the charter and all the subsequent settlements, and the deed of 1761, may be found ¿ra hcec verba; that it may also be found that the statutes de donis, uses, wills, and limitations have been adopted and received as laws in Maryland, and that the particular circumstances of Mr. Calvert's acquiescence, and the sales and improvements, See. be also found.
I infer from the above, that it is considered to be a point Of great importance to have the adoption of the above statutes expressly found, and therefore you will be pleased to consider whether it may not also be proper to find that the titles to a considerable share of real property in Maryland are held and secured under this adoption. As the statute de donis is to be thus found, it seems necessaiy to have the practice of barring entails by common recovery also found.
With the above view it may be necessary to find the 'Judges’ oath, and also the acts of assembly relative to common recoveries, of which there are two or three, particularly the act to aid defective recoveries, and the act of the last session, concerning estates-tail, &c.
In finding the recovery suffered by the late lord of the manor, it is to be considered whether our peculiar practice should not be found; for it differs not a little from the practice in England, I mean with respect particularly to the manner of appearing under a letter of attorney for an absent vouchee ; for in my practice I never knew a summons ad warrmtizandum. I don’t remember whether there was a *365 particular power given in the case to Mr. Goldsborough, to appear for Lord Baltimore, or whether he appeared in virtue of his office as attorney-general. Whatever power he acted under it seems should be found. It seems also very proper to find the death of Lady Baltimore, on whose marriage the settlements were made, without issue, and also the. death of Ccecilius Calvert without issue, before any steps taken to dispose of the manor; for by7 these events there was an end of the trusts respecting the above persons.
The name “ Manor,” perhaps, may mislead, if not explained and shewn to be merely descriptive, as black acre or white acre.
I do not understand what Mr. Hamersley means by the expressions “the particular circumstances of Mr. Calvert’s acquiescence,” unless he means what is alluded to in one of his former letters to me, in respect of a letter written by Mr. Calvert to the late lord, in which it is said he seemed to give up his pretensions, and applied to his lordship’s bounty. If this be the meaning, there is no legal evidence of the fact here.
It seems rather odd to find laws in a verdict, but as the cause will be finally determined in England., it may be thought proper for the information of the king and council. It seems it is the practice in other colonies, and I find many instances in which it was done here, by the note books of my father, when appeals home were expected, which were more common heretofore than of late times.
As to finding the charter in hcec verba, that will hardly be practicable ; for it is in abbreviated Latin, and therefore the substance of it can only be found, having particular regard to that part of it which enables the proprietary to grant in fee, in tail, 8cc.
Having understood that you have undertaken to draw up the notes for a special verdict, I have taken the liberty to send you the above extract from Mr. Samersky’s letter, with *366 the addition of a few other hints for your consideration, and am, siy, &c.-
DANIEL. DULANY.
8th October, 1773.

Opinion of John, Hall, Esq.

The Baltimore family having first attempted a settlement at Avalon, in Newfoundland, and finding that country too cold and barren, came further to the southward, and early in the reign of Charles L Ccecilius, then Lord Baltimore, of the kingdom of Ireland, applied to that monarch, and obtained a grant of the fertile country now known by the name of Maryland, with very extensive 'privileges. The charter bears date on the 20th day of June, in the 8th year of Charles I. Anno Domini, 1633. The clauses of that charter necessary to be taken notice of at present, are the 18th and 19th sections. By the 18th section, the lord proprietary has full power and license given him from time to time, at his pleasure, to assign, alien, grant, demise or enfeoff, so many, such and proportionate parts or parcels of the premises, to any person or persons willing to purchase the same, as he shall think convenient, to hold in fee, fee-tail, term of life, or years, under such rents and services as shall seem fit and agreeable, notwithstanding the statute of quia emptores. The 19th section gives license to the same baron of Baltimore and his heirs, to erect any parcels of land within the province aforesaid into manors, and in every of those manors to hold a Court Baron, and all things which to a Court Baron do belong, with view of frank-pledge, &c. Under the power or license given in this last section, particular tracts of land have been laid out in some way of other, probably by instructions given to the Judges of the land-office, and have been known and called by the name of manors. How they were erected does not appear to me, nor did I ever know or hear of Courts being *367 held under the name of Courts Baron, or under any other name particularly for those manors. In virtue of the powers contained in these sections, however, leases have been given, from time to time, for lands, parcel of the manors, generally for term of life or years ; and Anne Arundel Manor has been, I believe, almost entirely leased out. Whether with covenants to renew or not, does not appear to me.
The next title paper that appears to me is a family settles ment of the province of Maryland, made on the 31st day of December, 1698, between Charles Lord Baltimore and his eldest son and heir apparent, Benedict, of the one part, the Earl of Lchfield and his dau ghter, Charlotte Lee, of the second part, and the Dukeof ATorthum her land and other trus" tees, of the third part, on the marriage of Benedict with Lady Charlotte Lee, at a time when the government was in the hands of the crown. By this settlement, the province of Maryland, amongst other things, is conveyed by the name of all the country, province, and islands in America, commonly called Maryland, to the uses following, viz. to the use of Charles Calvert during his life, without impeachment; of waste; remainder to Benedict Calvert for life, in the same manner; remainder to trustees to preserve contiru gent remainders ; remainder to the first, second, and other sons of Benedict, on the body of Lady Charlotte begotten, in. Sail male, with other remainders relative to jointure, &c. with proviso that it ^should be lawful for Charles or Benedict Calvert to grant in fee unimproved lands; to lease manors for twenty-one years, or one, two or three lives; rever-, sion in fee to Charles Calvert. Benedict had issue, as the fact is stated, by Lady Charlotte, four sons, Charles, BenedictK Edward and Ccecilius ; the three last died without issue. In 1716 the government was restored to Charles, the grandson of Charles l,ord Baltimore, who appears at that time to have-been in his minority. He lived to old age, (dying in the year 17.71,) and was succeeded by the present I.ord Baltimore.
To the year 1730, Charles, late 7.ord Baltimore, on his *368 marriage with Mary, the youngest daughter of Sir Thee* dore Jansen, likewise made a settlement of the province of Maryland, amongst other things, by which the uses are limit®d to himself for life, without impeachment of waste 5 remainder to trustees to preserve contingent remainders; clauses to secure jointure ; remainder to the first and every other son of the marriage in tail male; reversion to himself in fee. Charles had issue by his wife Mary, one son, Frederick, and two' daughters, Louisa and Caroline. On the 17th day of November, in the year 1750, Charles late Lord Baltimore, made his last will and testament, and amongst other devises therein contained, deviáed Ann Arundel Manor to Benjamin Calvert, Esq. his heirs and assigns ; under which Benedict Calvert, Esq. of Prince George’s county -Claims title.
Frederick, the present Lord Baltimore, in the year 1753, likewise entered into articles for the settlement of the province of Maryland, on his marriage with Diana Egerton, one of the daughters of Scroop Egerton, late Duke of Bridge-water, deceased, in which the said marriage is recited as a matter in prospect. The former entails are recited. The terms on which the marriage was proposed to be held are also set forth. And then it is recited, that it was apprehended no plea could be held in the Courts of Westminster concerning the said province, for that the remedial writs of our lord the king do not run into the plantations or other parts beyond the seas. And it is also apprehended that the several Courts established in the same province or territory, under the authority of «he said-Frederick Lord Baltimore, as lord or proprietor of that territory, for the determining suits between the tenants or inhabitants of the said province, cannot hold plea.concerning the property or ownership of the said province, in cast: of any controversy concerning the same, the cognisance of such questions being conceived to belong to the king’s majesty, of whom, as superior lord, the said Frederick Lord Baltimore doth hold the said province as a feudatory tenant, by the rents and services ex *369 pressed in the charter or letters patent herein before mentioned. And whereas it will be necessary that the said Frederick Lord Baltimore, to be enabled to settle, convey, and assure the said province, lordship, or territory, in the manner proposed in the course of the said treaty, should acquire to himself, and be seised of a full and indefeasible estate in fee-simple, of and in the said province, lordship, or territory of Maryland; but though the estate and interest which he hath in the said province, is in nature oí aa estate of inheritance in tail male, and it is conceived to be incident and belonging to every such estate to be barrable by a common recovery, and the said Fredsrick Lord Haiti-more would be qualified to suffer such recovery, and thereby to bar such estate-tail, did the said territory or district of land lie in England; yet by reason that it is apprehended that there doth not exist any Court or jurisdiction before which any proceedings in nature of a common recovery for or concerning the said province or territory can be carried on or prosecuted, the said Frederick Lord Baltimore is wholly disabled to bar or dock the said estate-tail, and therefore cannot acquire the fee-simple of the said province to himself. And whereas there is great reason to expect that if the several matters aforesaid are in a dutiful manner represented to his majesty, he will be graciously pleased to give leave that an application be made to the parliament for the aid of the legislature iO enable the said Frederick Lord Baltimore to execute such deed, or do some such solemn act as may be enacted, and declared to be equivalent to, and tuve the force of, a common recovery, and may so operate as to vest an indefeasible estate of inheritance in fee-simple, freed and discharged from all entails, and ail remainders and reversions expectant, &c. Therefore proper covenants are to be entered into, to oblige Lord Baltimore to lay a most dutiful representation upon the matter aioresaid be tore his majesty, to petition for leave to apply to parliament for an act to enable him to bar said entails so subsisting, -and to use his utmost endeavours that such act may be obtained. Cmcilius Calvert, heir in tail,, *370 engages to join in the application for an act of parliament This settlement contains a great variety of other clauses not material to the point under consideration, and the less wor thy of notice, because, although the marriage took effect, the Lady Baltimore is since dead without issue. Whether any application was ever made to parliament or not, does not appear to me. I find a deed of settlement amongst the council records, by lease and release, leased 30th day of January., 1761, between Frederick Lord Baltimore and his uncle Ccecilius, deceased, of the one part, and the honourable Thomas Bennett, Earl of Tankeroille, and William Sharpe, Esq. one of the clerks of the privy council, of the other part, for one year,, in common form, to ground release on: the release dated the 31st of the same month, by way of indenture tripartite, between Frederick Lord Baltimore of the one part, the honourable Ccecilius Calvert, uncle, &c. of the se - cond part, and the earl < f Tankerville and William Sharpe, Esq. of the third part, recites a marriage agreement in March, 1753, to secure the payment of 800/. per annum to the baroness dowager of Baltimore, ten thousand pounds for the portions of Louisa and Caroline Calvert, and two thousand a year to Lady Diana Egerton; province of Maryland to be settled and assured, &c. on Lord Baltimore for life, with divers remainders. It recites that the said marriage did take effect in pursuance of the said recited indenture, and in performance of such covenants and agreements as are now, and remain to be executed, and for docking, barring, and extinguishing all estates-tail, and all remainders and reversions, and all other estates of and in the said province, lordship, &c. called Maryland, and for settling and assuring the same to the several uses and trusts after ex - pressed, and in consideration of ten shillings sterling, Frederick Lord Baltimore and Ccecilius Calvert convey said province to the trustees aforesaid and their heirs, to hold to the use of Frederick Lord Baltimore, during his natural life, without impeachment of waste, and with power to commit waste; remainder to trustees to preserve contingent re *371 unainders; remainder to the first, second, and every other son of Ccecilius Calvert, in tail male; remainder to the use o* such person and persons, and for such estates as Lord Baltimare, by deed executed in presence of two witnesses, or by his last will shall limit and appoint; remainder, in case of no such appointment, to the use of such persons and for such estates as the reversion of the same premises now stands limited to, and devised by, the last will and testament of Charles Lord Baltimore, deceased. Proviso, saving the power of government; right of consenting to exchange i division or partition with other governments adjacent; righ1 of granting and leasing, as in other settlements; power to make jointures ; to charge the province with a sum not exceeding twenty thousand pounds for daughters’ portions ; co* venant for further assurance to the same uses, acknowledged before Thomas Lane, I suppose Master in Chancery, and enrolled in the High Court of Chancery, on the 4th of Fe' bruary, 1761.
What I find next is a conveyance of lease and release from Frederick Lord Baltimore to the Reverend Bennett Allen, of Ann Arundel Manor, and all other the manors within the province. The lease bears date the 7th of April, 1767, for one year, in common form. The release bears date the 18th day of the same month, tripartite between the lord proprietary of the first part, the Reverend Bennett Allen, of the second part, and the honourable Walter Dulany, Esq. of the third part; recites the former entails, 1698 and 1730; recites a former conveyance made by Lord Baltimore and Ccecilius Calvert, to the honourable Thomas Bennett and William Sharpe, Esq. of th, province of Maryland, dated the 30th and 31st days of January, 1761, enrolled in the chancery of England, and recorded in Maryland, but does not set out the use in said deed contained and limited; recites the instructions dated in February and November, 1766, to his excellency 11, ratio Sharpe, Esq. the honourable Daniel Dulany, and John Morion Jordon, Esq’rs. for sell ng the manors, and that they had made considerable progress therein; recites that the former entail, subsisting *372 upon the entire province, had been already effectually barred and destroyed by the deeds in 1761, and that the said Lord Baltimore had acquired an indefeasible estate in fee by the said deed, according to the usage in like cases, (there being no other established method for barring entails upon the entirety of the said province, and other the premises,) yet in regard to the subsequent limitations and dispositions, created and made by the said last recited indentures, and for facilitating the sale of the manors, &c., the scheme of the deed is to make Walter Dulany, demandant, Bennett Allen, tenant to the prcecipe ; the Lord Baltimore to come in either personally or by attorney, as vouchee, and to vouch over the common vouchee ; the parties to stand seised to the use of the Lord Baltimore in fee, with an express proviso, that nothing in that deed should frustrate or destroy, or in any manner derogate from, or invalidate, impeach, prejudice, oraffect the said recited deeds of lease and release, dated in January, 1761, but that the same should stand in full force and vigour as to the entire province and the whole territory called Maryland, (Anne Arundel and other manors only excepted.) There is a power of attorney also, or writing purporting to be a power of attorney, from Lord Baltimore, dated the 8th of April, 1767, to the Honourable--Goldsborough, Esq. attorney-general of the said province, or any other attorney-general of the sarpe province, to appear, and in the name and behalf of the said Lord Baltimore, to enter into warranty and vouch over common vouchee. Executed before Hugh Hamersley and Giles Hitchcock, and proved by Hitchcock before the mayor of London. In consequence of this deed to make a tenant to the prcecipe, at an adjourned Provincial Court in the month of July last past, a writ of entry sur disseisin was issued out in the name of Frederick Lord Baltimore to the Sheriff of Anne Arundel county, Walter Dulany, demandant, Bennett Aden, tenant, of all that tract or parcel of land called Anne Arundel Manor, &c.; bearing date the 1st day of April, in the 17th year of the dominion. Declaration in common *373 form. Walter Dulamj, demandant, recovers against Bennett Alien, he over against the lord proprietary, and the lord proprietary against William Rawhns, the common vouchee. Writ of seisin is prayed returnable to the third Tuesday in October next, and I presume has been issued, but cannot be as yet returned.
I have been thus circumstantial in stating the facts on which my opinion is founded, because every gentleman interested mav have an opportunity of considering them and judging for himself. Proper allowance, I doubt not, will be made for the short time I have had to consider an affair •of so great extent. The charter to the first lord proprietary gives him an estate in fee-simple with ample powers. Those that immediately relate to this matter may be seen in the 18th and 19th sections of the charter printed in Bacon’s laws. The settlement made by the first Charles Lord Baltimore in 1698, is in my opinion'of sufficient force and validity to work an alteration of that estate, and without saying any thing of the settlement made by the late Lord Baltimore, in 1730, I look upon it that Frederick, the present lord proprietary, at the time of his coming to the government upon the decease of his father, was seised of an estate in tail male under the deeds made by his great grandfather. And I do not think the father of the present Lord Baltimore had power by testament to devise Anne Arundel Manor, or any other part of the province, to any person whatever, to take effect otherwise than upon the death of the present Lord Baltimore without issue male, and without exercising that power which 1 think he has of docking the entail. But should no other steps be taken than what have been already, I doubt much whether the entail would be barred. There are some very strong recitals in the marriage articles, with regard to the manner in which the entail ought to be docked; jt appears clearly from those recitals to be the opinion of gentlemen in England, and even of Lord Baltimore himself, that the entail on the entire province could not be barred but by act of parliament. No process from the Courts of *374 Westminster would reach us, and the Courts in this province are looked upon not to have competent jurisdiction so as that the loid proprietary would bar the entail on the entire province j if so, how can he be vouched for the most valuable part of it, or where must he stop ? I am not clear in this point the one way or the other. It has been the prevailing doctrine here that the lord proprietary, like the king at home, cannot be disseised, and the proceeding in common recovery is grounded upon a disseisin, and although he comes in as vouchee, yet I do not know what consequences might be deduced from this doctrine, where it appears from the deeds to lead to the uses, and from the whole complexion of the affair, that the lord proprietary is the real person concerned, and that the intention of the recovery is to gain him an estate in fee. Adversary suits are brought in the Courts of Justice within this province, where the lord proprietary is plaintiff, and every day’s experience shows that such suits may be maintained; but I never knew an action where he was defendant. The common method of trying title, where the lord proprietary is concerned, is to bring ejectments against his tenants, and then the Courts hold plea. What ought to be the opinion of Judges in England,, in case the dispute were carried thither by appeal, is uncertain. Recitals demonsit ate what opinion has been already formed. And, therefore, I much admire no steps were ever taken to procure an act of parliament which would have put a short end to ail controversy about it, more especially as this seems to have been a matter in contemplation at the time of the marriage articles in 1753. Another objection appears to me considerable; how can it consist with the settlement in the year 176Í, in which Lord Baltimore and Cwcilius Calvert both joined to the Earl of Tankerville and William Sharpe, Esq. that the Lord Baltimore should have an estate sufficient to make a tenant to the prcecipe without the trustees or the survivor of them joining in the deed. The settlement, though it cannot in my opinion operate so as to extinguish the estate-tail on the entire province, has certainly *375 tested the legal estate in trustees to the uses therein mentioned. The lord proprietary is tenant for life with divers remainders over, one of which is to the use of such persons and for such estates as the reversion of the same premises now stands limited to and devised by the last will and testament uf Charles Lord Baltimore, deceased, under which, I take it, the devise to Mr. Calvert is included. If it could be supposed not necessary for the trustees to join, what is there to prevent Lord Baltimore from defeating that whole settlement without their consent; for if he can gain a fee in the manors without them, by the same parity of reason he may gain a fee in all the rest of the province without them, and to what purpose would be those deeds ?
Another objection appears to me to have great weight, and is quite apparent to any one that knows the method of proceeding in recoveries. Where they are suffered in this province, and if we can trust to our law books, in the island of Great Britain, by power of attorney, the same must be taken by one of the Judges of the Court; or by dedimus .• our practice is so, and evils might follow not easy to guard against were it otherwise. Where a Judge of the Court does not take the power of attorney, the course is to issue a writ of entry and send dedimus to take acknowledgment of deeds and powers of attorney, &c.
Upon the whole I am of opinion that it is unsafe to purchase under the title as it stands at present. It is not certain what would be the opinion of Judges in England, with regard to the Courts in this province having competent jurisdiction, were the matter carried thither by appeal. It would have been much better that the trustees had joined in the deeds to make a tenant to the prcccipe, for if this be not necessary, the consequence will follow that the whole settlement in 1761 may be defeated without their consent. If there were no doubts upon either of these points, as I do think there are, yet the power of attorney is utterly new and irregular, and ought to have been taken by dedimus. There is one thing that satisfies me how little regard is to *376 be paid to some parts of the deed to make a tenant: after reciting the settlement of 1761, the deed asserts that Lord Baltimore had thereby acquired an indefeasible estate in fee according to the usage in like cases. There is no usage, I believe, that can be pointed out to bar entails by a simple deed recorded in the Chancery, and what follows just after in a parenthesis is very remarkable (there being no other established method for barring entails upon the entirety of the said province and other the premises.) These are my sentiments upon the occasion. It is with reluctance I have given any opinion. I cannot conclude without observing that many of these settlements, particularly those in 1698 and 1730, are entirely in the custody or power of the Baltimore family, and certainly attested copies of them ought to be sent over and recorded here for the safety of purchasers.
The lord proprietary no doubt would be bound by his warranty, but after his death the heirs would not be bound without assets in fee descended, and the whole family estate seems to be entailed. And this further inconvenience would attend the purchasers in cases of eviction : they must follow the lord proprietary or his heirs into the Courts of Justice in England, where they reside.
J. HALL.